FREDERICK D. STOREY *against* SAMUEL N. SALOMON.

HOBART GRIFFEN *against* THE SAME.

(Decided December 4th, 1876.)

Where the defendant made an agreement in writing, known among stock brokers as a "*stock privilege*" and of the special nature known as a "*stradd'e*," by which the defendant, for value received, agreed to buy from or sell to the bearer of the writing, a certain number of shares of the stock of a certain company at a certain price: *Held*, that this was not a gaming contract, as it did not appear upon its face that the maker was merely to pay the difference, and was not

bound to receive or to deliver the stock, and that if it was in fact intended as a cover for such a contract, that must be specially pleaded and proved to show that it was void under the statute against betting and gaming.

*Held*, further, that the evidence of stock brokers could be introduced to explain abbreviated expressions used in the writing or indorsed on it.

APPEAL by defendant from a judgment of the Marine Court, entered on an order of that court at the general term thereof, affirming a judgment of that court entered on the verdict of a jury rendered by direction of a judge of that court at trial term.

The complaint alleged " that on the 15th day of May, 1875, at the city of New York, the defendant made his certain contract in writing with the plaintiff, whereby, for value received, the defendant agreed that he would, at any time in thirty days from said date, either deliver to or receive from the plaintiff one hundred shares of the capital stock of the Western Union Telegraph Co., at 77½ per cent , and that all dividends or extra dividends should go with said stock subscribed, and delivered the same to the plaintiff for value, which the plaintiff paid him therefor.

" That on or about the 27th day of May, 1875, the defendant waived the performance of said contract on the part of the plaintiff, but when said stock became deliverable, in pursuance of said contract, the plaintiff elected and offered to deliver the same to the defendant, but the defendant refused to receive the same, and then, to wit, on the 28th day of May, 1875, by indorsement in writing upon said contract, settled the same upon the basis of the difference between the then market value or price of said stock, to wit, 72¾ per cent., and the sum or price which the defendant agreed to pay therefor by the terms of said contract, to wit, 77½ per cent., and the defendant, for value and in consideration of the premises, promised and agreed to pay the plaintiff the sum of four hundred and seventy-five dollars," as damages for the defendant's failure to perform his contract, and that the defendant, although requested so to do, had never paid the same.

The answer admitted that the defendant had made a contract of the general nature of that mentioned in the complaint,

but denied having made it with the plaintiff, and denied all the other allegations of the complaint.

On the trial it was admitted that the defendant signed and delivered a writing in the following form, viz :

"NEW YORK, May 15th, 1875.

"For value received, the bearer may call on the undersigned for one hundred (100) shares of the capital stock of the Western Union Telegraph Company, at seventy-seven and one-half ($77\frac{1}{2}$) per cent., any time in thirty (30) days from date.

"Or, the bearer may, at his option, deliver the same to the undersigned at seventy-seven and one-half ($77\frac{1}{2}$) per cent., any time within the period named, one day's notice required.

"All dividends or extra dividends declared during the time are to go with the stock in either case, and this instrument is to be surrendered upon the stock being either called or delivered.

"Expires June 14th, 1875, $1\frac{3}{4}$ P. M.

"S. N. SALOMON."

And that on May 28th, 1875, he made the following indorsement on the back of it :

"Settled at market $72\frac{3}{4}$—S. N. Salomon."

The plaintiff then offered as a witness one John B. Gatenby, who testified that he was a stock broker, and had been so for ten years, in the city of New York ; and was acquainted with dealings in stock and the language employed by brokers in stock contracts ; was familiar with contracts of the character of the one put in evidence ; that he knew the defendant Salomon ; and that he suspended May 28th, 1875.

The plaintiff, against the objection of the defendant, was then allowed to ask the witness the meaning among brokers and dealers in stock, of the words "settled at the market $72\frac{3}{4}$," as applied to such a contract as the one in evidence, to which the witness answered :

"I understand the universal custom is, Mr. Salomon was liable for the difference between the market price of stock, $72\frac{3}{4}$, on the day he agreed to the contract, and the face of the contract, which was $77\frac{1}{2}$ in money value ; that he was liable for that

amount on the contract to whoever held it; that difference is 4¾ per cent., which, upon the whole stock, would be $475.

"Q. Has that language any such meaning with regard to the terms of the original contract as to the delivery or right to deliver or demand the stock?"

The defendant's objection to this question was overruled, and the witness answered:

"I understand the contract is then at an end; that settles the contract, so that the party holding the contract has no more right to deliver or receive from him the stock—that the contract is canceled. The defendant at that time was a stock broker and member of the Stock Exchange."

The defendant offered no evidence, but at the close of the case moved to dismiss the complaint on the grounds: 1. That the contract, as proved, is void under the statute. 2. That no tender of stock, under the contract, is proved. 3. That there is no evidence of any issue of stock by the Western Union Telegraph Company.

The motion was denied, and the defendant excepted. The defendant then asked to go to the jury on the following questions: 1. Whether, by the terms of the contract any stock was to be actually delivered, or whether it was intended between the parties merely to settle on the difference? 2. What meaning was intended by the indorsement on the back of the contract? 3. Whether there was any tender of stock under the contract, or any waiver thereof? 4. Whether this was a contract for the sale or purchase, transfer or delivery of stock? 5. Whether there was ever any issue of stock by the Western Union Telegraph Company?

The requests were refused and the defendant excepted.

The court then directed a verdict for the plaintiff for $493 44, to which the defendant excepted.

*John E. Develin*, for appellant, argued that the contract, as proved, was void under the following extract from the Revised Statutes: "All wagers, bets or stakes made to depend upon any race or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event whatever, shall be unlawful. All contracts for or on account of any

money or property or thing in action so wagered, bet or staked, shall be void" (1 R. S. § 8, art. 3, tit. 8, ch. 20 [Edm. ed. p. 614], 662). It sufficiently appears by the testimony, and the court too will take judicial notice of the fact, that stocks have a market value, and that such value is fluctuating and uncertain, or in the language of the statute, "depends upon unknown and contingent events" in the future.

The substance and intent of the transaction between plaintiff and defendant are plain. If the stock remained during the life of the contract at the price mentioned in it, the party entitled to demand or to deliver the shares would have no interest or motive to avail himself of either alternative. In either case he would pay or receive for the stock the very same sum mentioned in the contract. It would be like transferring money from one pocket to the other. But if the stock rose above or fell below the price named in the contract, then it would be enforced, for a profit would necessarily accrue to the holder of it. The whole thing was, therefore, a bet by the defendant that the price of Western Union Telegraph stock would remain at $77½ per share for thirty days, whilst the plaintiff bet that it would not. If it did, the latter would lose the amount paid by him for the "straddle." This is a common practice with the betting fraternity, and is known as giving a party so much to induce him to make the bet. If it did not remain at the named price, the defendant would lose the difference between the market and the contract price. The "unknown or contingent event" named in the statute is, therefore, in this case, the rise or fall in the price of this stock, and on this "event" the winning of the bet on the one hand, and the loss of it on the other, was made to "depend," just as much as if the wager had been laid on a given horse in a race, or on the turning of a penny. It is entirely clear that contracts like these cannot be made *bona fide* for the actual sale or purchase of stocks, or for any legitimate business purpose. The defendant makes a contract, by the terms of which he may be compelled to purchase or to sell, or he may be permitted to do neither. Such a transaction is not, in any sense, a business transaction contemplating the actual delivery of the subject-matter of the contract. Nor could it,

by reason of its uncertainty, enable either party to make any substantial dealings on the strength of it. It is gambling pure and simple, and as such, in itself and in its consequences, deserving the reprobation bestowed upon it by the statute and by the moral sense of the community. It is absurd to suppose that in any case the plaintiff intended to deliver unless he could deliver for less than 77½ per cent., or that he would call on defendant to deliver unless it was impossible to deliver for less than that price. So that the whole transaction, upon the slightest analysis of its real character, settles down into a wager that the price would not vary within thirty days. That transactions of this kind are merely wagers is abundantly settled by authority (*In the Matter of Chandler & Co.* U. S. Dist. Ct. N. D. of Ill. 9 Nat. B'kr'ptcy Reg. 514; *Cassard* v. *Hinman,* 14 How. Pr. 84, and cases cited; s. c. affi'd, 1 Bosw. 207; *Brua's Appeal,* 55 Penn. St. 294; *Grizewood* v. *Blain,* 11 C. B. [73 Eng. Com. Law Rep.] 526).

But the statute of 1858, ch. 134, is relied on to establish the legality of these contracts. There is no question but that prior to that statute, both by statute and at common law, they were void (*Staples* v. *Gould,* 9 N. Y. 520; *Thompson* v. *Salomon,* decided by Judge Lawrence, Daily Law Reg. Dec. 9, 1865). That statute provides that no "contract, written or verbal, hereafter made for the purchase, sale, transfer, or delivery of any * * share or interest in the stock of any bank or of any company incorporated under any law of the United States, or of any individual State, shall be void or voidable for any want of consideration, or because of the non-payment of any consideration, or because the vendee at the time of making such contract is not the owner or possessor of the certificate or certificates or other evidence of such debt, share, or interest." The statute was enacted to get rid of sections 6, 7 and 8 of article II of title 19 of chapter 20, 1st part of Revised Statutes. By this article, time sales of stock by non-holders were made illegal, and it remained in force until 1858, when it was repealed by chapter 134 of the laws of that year. As such transactions had been made illegal only by this article, its repeal would seem to have been all that was necessary to restore them

to legality. But the promoters of the act of 1858 went further, and, in addition to the repeal of the obnoxious article, obtained the enactment of the first section of chapter 134 of Laws of 1858, which declared that certain contracts for stocks should not be void, or voidable, by reason of the parties not having the stocks, or for want of consideration. This is the entire scope and effect of the first section of the act of 1858. It does not, therefore, touch the defendant's position in this case, which is, not that the parties dealt without having the stock, or that there was no consideration for the contract; but that the transaction was a wager, within the act to prevent betting and gaming. (*a*) This is not a contract for " the purchase, sale, transfer, or delivery of stock." (*b*) No tender of the stock was proved; none was attempted. It was assumed by the plaintiff to have been waived by the indorsement under the testimony concerning the custom. (*c*) The law of 1858 is in derogation of the common law, and must be strictly construed. If no stock was ever issued by the Western Union Telegraph Company, the contract is not brought within the statute, and is void. It was the duty of the plaintiff to have proved such issue of stock. Proof of the requirements of the statute of 1858, which take a time stock transaction out of the effect of the statute against gaming, cannot be waived on the trial of an action in which the validity under it of such transaction is at issue. The latter statute has its origin in the public policy to uphold morality by preventing gambling. That a party may have the benefit of the former, he must bring himself under such of its provisions as will take the transaction out of the operation of the latter statute and the common law against gaming. Therefore, no admission by the defendant, whether in his contract or otherwise, will be sufficient to establish the fact that the transaction, otherwise void, is brought within and saved by the act of 1858. The saving facts must be proved. The rule *volenti non fit injuria* will never be applied when the waiver is of a matter which public policy has established, and, therefore, will uphold in the interests of the people.

*L. A. Gould,* for respondent.

VAN HOESEN, J.—These two actions involve the same questions, and were argued and are to be decided together. The observations which follow are made with reference to the Storey case, though they apply equally to the Griffin case.

The action is to recover the amount due from Salomon to Storey upon a contract known, in the parlance of Wall street, as a *straddle*. A straddle is said to be a double privilege, in other words, a *put* and a *call* combined. In this instance it is, in plain language, an option possessed by Storey either to demand from Salomon, or to sell and deliver to him, within thirty days from May 15, 1875, one hundred shares of the capital stock of the Western Union Telegraph Company, at the rate of seventy-seven dollars and a half per share. An option has been pronounced to be valid in law, when supported by a sufficient consideration.

No question of consideration arises in this case. It was urged by the counsel for the defendant, upon the argument, that a straddle is an illegal contract, because it cannot be anything else than a mere wager that the stock which is to be *put* or to be *called* will, for the period named in the instrument, remain without fluctuation at a designated price. It was further said that a bare inspection of such a contract shows that the contracting parties do not contemplate an actual purchase or an actual sale of stocks, but simply the payment of the difference between the price named in the straddle and the price to which the stock may rise or may fall within the stipulated time.

If the necessary and obvious meaning of a straddle is that the maker of it shall merely pay a *difference*, but not be bound to receive or to deliver the stock, it is a gambling contract, and utterly illegal and void. If, however, such be not the unmistakable import of its language, then whether or not it is a gambling contract will depend upon the actual and covert intention of the parties. If they contemplated merely the payment of a difference, the straddle is illegal ; but if the delivery of stock, it is a valid contract. I cannot say, for I do not believe, that a straddle always means, or that the parties to it always intend, that a difference only need be paid. The con-

tract in this case makes provision that " all dividends and extra dividends declared during the time are to go with the stock." This language plainly contemplates an actual delivery of stock; and I have no right to presume, without an iota of evidence to that effect, that it was introduced merely to cloak and cover up the unlawful design of the parties to gamble for a difference.

The straddle is not, in my opinion, upon its face illegal; and if it were made illegal by the intent of the parties, the defendant should have alleged such illegality in his answer, and proved it on the trial (*O' Toole* v. *Garvin*, 1 Hun, 92, and cases there cited). This he has utterly failed to do.

It is further contended by the counsel for the defendant that a new trial should be ordered for errors committed by the court below in receiving evidence offered by the plaintiff.

It is evident, from a perusal of the complaint, that, when it was prepared, the plaintiff was laboring under an apprehension that the straddle would be attacked by the defendant as a gambling contract, and therefore the pleader inserted a number of allegations respecting an offer to deliver, and the refusal of the defendant to receive, the stock. These allegations were, I think, entirely unnecessary, for the plaintiff's claim was really upon an account stated. Upon the trial, the plaintiff, instead of proving his allegations of a tender of the.stock by himself, and a refusal on the part of the defendant to receive it, called a witness to prove a usage among brokers which makes it unnecessary to tender stock to a broker who had suspended payment. Evidence of an excuse for failing to make a tender was not admissible under the allegation of tender, but no objection was made upon that ground. An amendment, even if such objection had been made, would doubtless have been permitted. It was shown that the defendant had suspended before the straddle had expired, and before the ascertainment of the amount pay-. able upon the straddle was reached by the parties. This evidence of usage was, in my opinion, entirely unnecessary, and I think it will appear to have been harmless as well as needless. If so, the admission of it ought not to cause the reversal of the judgment (*Smith* v. *Paton*, 31 N. Y. 66).

I have said that the plaintiff's cause of action was really an

account stated. The complaint alleged an accounting between the parties by which it was agreed that the defendant should pay the plaintiff $475 in settlement of the straddle; the market price of the stock at the time of the settlement being seventy-two dollars and seventy-five cents per share, and the price named in the contract being seventy-seven dollars and a half per share.

These allegations in the complaint were fully proved upon the trial by the written contracts and the written admissions of the defendant. A perfect case was thus made out, and no evidence of a usage among brokers was required.

There was no impropriety in calling a witness to explain the meaning of the incomplete expression contained in the paper which I have called an account stated. I doubt, if such explanation were necessary, though it certainly was competent.

I think the words "Settled at market 72¾. S. N. Salomon," indorsed upon the *straddle*, would be understood by any court without the aid of an expert to explain their meaning (*Dana* v. *Fiedler*, 12 N. Y. 45, 46).

As I have already said, when the plaintiff had put in evidence the straddle, with the indorsement upon it, and had proved the meaning of those expressions which were abbreviated or incomplete, he had proved all that was necessary to entitle him to a verdict. The other evidence was needless, but could not possibly have injured the defendant. In the absence of evidence on the part of the defendant, there was no question to submit to the jury, and it was the duty of the court to direct a verdict.

The judgments, in both the Griffen and the Storey cases, should be affirmed, with costs.

JOSEPH F. DALY, J., concurred.

Judgment affirmed.*

* Affirmed in the Court of Appeals, December 11th, 1877.